**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Case No. 26-cr-89 (BAH) |
| **v.** | |
| **MICHAEL COLLINS,** | |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Less than two weeks after Michael Collins was released from custody for an unauthorized removal-of-a-motor-vehicle conviction, he unlawfully acquired a firearm and used it to rob another person at gunpoint. This was not an isolated lapse in judgment. It was the latest chapter in his life marked by escalating violence and repeated firearms offenses. His actions here demonstrate that prior convictions, prior incarceration, and prior opportunities for rehabilitation have failed to deter him from committing crimes.

The defendant has accepted responsibility and is now before the Court to be sentenced for unlawful possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Given the defendant's repeated resort to armed violence, his rapid recidivism following release from custody, and his demonstrated inability to conform his conduct to the law, a substantial sentence is necessary to protect the public, promote respect for the law, provide just punishment, and deter future criminal conduct.  Accordingly, the government, respectfully, requests the Court sentence the defendant to a period of **71 months** of incarceration, followed by three years of supervised release.

### I.      BACKGROUND

On February 15, 2026, the complainant went to the Metropolitan Police Department's

Seventh District station to report a robbery that took place the previous evening in the vicinity of Naylor Road SE and Marion Barry Avenue SE in Washington, D.C.

The defendant, Micheal Collins, cased the defendant before crossing the street to rob him. The complainant turned into a parking lot and thought he had lost sight of the defendant. But soon the defendant stepped out from behind a parked car and pointed a firearm at the complainant, robbing him of his apple iPhone and AirPods. After ordering the complainant to deactivate any passwords on his phone, the defendant left with the iPhone and AirPods.

Officers later recovered surveillance footage from a camera at the intersection of Naylor Road SE and Marion Barry Avenue SE, which captured the defendant casing the complainant. During the initial interview with police on February 15, the complainant used Apple's Find My feature, which indicated that the iPhone and AirPods were located at an apartment in Southeast D.C. On February 17, the complainant again used the Find My feature, which indicated that the property was at the same location.

That same day, the complainant and his mother noticed a series of unauthorized purchases on his mother's Amazon account. The complainant's mother cancelled most of the transactions but could not cancel the purchase of an iPhone and AirPods. Those items were scheduled to be delivered to Michael Collins at an apartment in Southeast D.C., on February 18, 2026. When the complainant accessed his iCloud account, there was a picture of an identification card depicting the defendant. The complainant said that the person in the identification card was the person who robbed him. In addition, the complainant's TikTok account posted two videos depicting someone who looked like the defendant. The complainant said he did not post the videos.

2



**Still Photo of a Video the Defendant Posted to the Complainant's TikTok**

On February 18, 2026, MPD officers went to the apartment complex in anticipation of the scheduled delivery of the iPhone and AirPods to the defendant. While surveilling the area, officers saw the defendant walking across a church parking lot behind the apartment complex. The officers approached the defendant, but the defendant went into the apartment complex and broke into a run. Officers pursued the defendant through hallways in the building, losing sight of him after he went around a corner. Eventually, the defendant ran out of the building and stopped in a parking lot. He raised his hands, lifted his shirt to reveal his waistband, and said that he had nothing on him.

The defendant identified himself to officers. He was wearing shoes that looked like those of the person who followed the complainant the night of the robbery. And he wore a gray hooded sweatshirt with white strings that looked like the one worn by the person in the videos posted to the complainant's TikTok account. Officers placed the defendant under arrest for the robbery.

Officers retraced Collins's flight path through the apartment complex. In the portion of the hallway where officers lost sight of Collins, there was a laundry room. Inside an open washing

machine, officers found a firearm. The firearm was a Ruger, model P90DC, .45 caliber semiautomatic handgun bearing serial number 660-45708. It was loaded with six rounds of ammunition in an eight-round-capacity magazine.



**Photo of the Firearm Inside of the Open Washing Machine**

Officers soon executed a search warrant for the apartment where the iPhone and AirPods were set to be delivered. There, they found the complainant's iPhone, a notebook containing personal information for the complainant (including phone numbers and a password), a Ruger gun bag, and approximately 80 cartridges of ammunition.

Officers took the defendant to the MPD's Seventh District station. An MPD officer and an ATF agent read the defendant his *Miranda* rights, then the two investigators interviewed him. During the interview, the defendant admitted that he possessed the firearm the officers had recovered after the chase. The defendant also eventually admitted that he committed the robbery and tried to buy items on Amazon using someone else's payment methods. In addition, the

defendant said that he lived at the apartment where he had ordered the iPhone and AirPods delivered.

On February 20, 2026, the defendant was charged by complaint in U.S. District Court. On February 23, 2026, the defendant appeared in court for his initial appearance, whereupon the government moved for his pretrial detention. The defendant later consented to detention.

On May 7, 2026, the defendant entered a guilty plea pursuant to a negotiated agreement to one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1). (ECF no. 15). Pursuant to the plea agreement, the parties calculated the defendant's exposure under the U.S. Sentencing Guidelines (the "Guidelines") at 57 – 71 months, at a final offense level of 21 in Criminal History Category IV.[1]

Sentencing is scheduled for August 7, 2026, at 9:30 AM.

## II.     LEGAL STANDARD

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

---

[1] Based on information from the Final Presentence Investigation Report (ECF No. 24), the Guidelines range is 100 – 125 months at a final offense level of 25 in Criminal History Category V.

The listed factors in 18 U.S.C. § 3553(a) include the following:

>   (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>   (2) the need for the sentence imposed –
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
>   (3) the kinds of sentences available;
>
>   (4) the kinds of sentence and the sentencing range established for –
>   (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>   (i) issued by the Sentencing Commission . . .; and
>   (ii) that, . . . are in effect on the date the defendant is sentenced; . . .
>
>   (5) any pertinent policy statement –
>   (A) issued by the Sentencing Commission . . . and
>   (B) that, . . . is in effect on the date the defendant is sentenced.
>
>   (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
>   (7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court

can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## III.   THE GOVERNMENT'S SENTENCING RECOMMENDATION

### A.  The Nature and Circumstances of the Offense

The defendant, a convicted felon, armed himself with a loaded firearm and used it to rob an innocent member of the community. Brandishing a loaded firearm to instill fear and steal someone's property is "undeniably serious." *See United States v. Thomas*, 456 F. Supp. 3d 69, 76 (D.D.C. 2020); *see also United States v. Roba*, No. 17-cr-123 (GMH), 2017 WL 3025840, at *5 (D.D.C. July 17, 2017) (describing offenses including D.C. Code armed robbery as "both serious and violent in nature"). It "has great potential to escalate into violence," especially when "the carrier has a violent history" like the defendant does. *Cf. United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (describing merely "carrying a loaded firearm"). Even if the defendant had no intention of discharging the firearm could have provoked "law enforcement or others to respond with deadly force, posing a threat to innocent bystanders." *See Thomas*, 456 F. Supp. 3d at 69. Armed robbery is not merely a property crime – it is a crime of intimidation, coercion, and violence that places victims, bystanders and responding officers at extraordinary risk. Every time

a firearm is brandished in a robbery, there is substantial possibility that someone will be seriously injured, or killed, whether by the defendant, a victim attempting to defend himself, or law enforcement responding to the scene.

The danger posed by this offense is magnified by it's timing. Less than two weeks after he was released from custody and while a three-and-a-half-year prison sentence hung over his head- the defendant chose to arm himself and commit yet another armed robbery. Neither incarceration nor the prospect of additional imprisonment deterred him. Instead, almost immediately upon regaining his freedom, the defendant armed himself with a firearm and committed yet another violent robbery- the same violent conduct that defined much of his adult criminal history. *See United States v. Kent*, 496 F. Supp. 3d 500, 502 (D.D.C. 2020) ("Of particular significance is that Defendant was on supervised release at the time of his arrest in this matter[.]" (citation omitted)). This rapid return to violent criminal conduct demonstrates an extraordinary risk of recidivism and underscores the need for a substantial sentence to protect the public and promote respect for the law. A 71-month period of incarceration is justified.

### B. The History and Characteristics of the Defendant

The defendant's criminal history demonstrates a concerted pattern of using a firearm to take property from others – despite having served significant periods of incarceration and doing so while on court supervision. Indeed, just two weeks after being released from incarceration for his car theft conviction, did he commit the instant offense.

The defendant committed his first adult offense when he was 18, when in 2011, he attempted to burglarize someone's home. He pled guilty to that offense in Prince George's County Circuit Court case number CT110502 and was sentenced to three years of imprisonment with all but 30 days suspended.

8

That sentence did not deter him. Despite this period of incarceration and court supervision, within roughly a year, the defendant committed two armed robberies. On November 21, 2013, the defendant and two others brandished a silver handgun to a victim, demanded his property, and stole his jacket, backpack, cell phone, iPod, shoes, and headphones. Just weeks later, on December 3, 2013, the defendant and two others, again, brandished a silver handgun to a victim, demanded his property, and stole his jacket, cell phone, backpack, shoes, headphones, and other personal property. The defendant pled guilty to robbery in Prince George's County Circuit Court case numbers CT150218X and CT140042A and was sentenced to concurrent terms of 15 years of imprisonment with all but five years suspended. Additionally, his probation in the burglary case was revoked and he was sentenced to three years of prison.

Yet again, the defendant's years of incarceration did little to deter his dangerous criminal behavior. On July 28, 2025, while armed with a gun, the defendant stole a man's vehicle along with his personal property outside of a convenience store in Oxon Hill, Maryland. The defendant pled guilty in Prince George's County Circuit Court case number C-16-CR-25-002158, and was sentenced to four years of incarceration, with all but 189 days suspended.

These convictions established a pattern that has continued throughout the defendant's adult life: when given the opportunity, he repeatedly arms himself with a firearm and uses violence to steal from others. Prior incarceration, probation and lengthy prison sentences have not deterred him. Instead, each encounter with the criminal justice system has been followed by another serious violent offense. The defendant remains a danger to the community and should serve a significant period of incarceration.

## C. The Need for the Sentence Imposed

A sentence of 71 months of imprisonment is necessary for public safety, as well as specific

and general deterrence. The fact that this is the defendant's fourth theft offense – the third of which involved the possession of a firearm – demonstrates the need for a lengthy period of incarceration. Shorter periods of incarceration have clearly done little to deter the defendant and protect the public from his actions. A longer term of imprisonment would signal to the defendant that his criminal actions will now be punished more severely than ever before. Accordingly, a period of 71 months – more time than the defendant has ever served in prison – would be sufficient but no greater than necessary to serve these goals.

### D. The Need to Avoid Unwarranted Sentencing Disparities

According to the Judiciary Sentencing Information (JSIN), during the last five years, at offense level 21 and Criminal History Category IV, the average length of imprisonment was 56 months, and the median length of imprisonment was 57 months. At offense level 25 and Criminal History Category V, the average length of imprisonment was 91 months, and the median length of imprisonment was 100 months. The parties negotiated an agreement in this case which contemplated a sentencing range of 57 – 71 months. Although the government's proposed sentence is at the top of that range, it would not result in unwarranted sentencing disparities due to the violence presented in this offense and the defendant's rapid and dangerous recidivism.

### IV.    CONCLUSION

For the foregoing reasons, the government respectfully recommends that the Court sentence the defendant to a term of imprisonment of **71 months** to be followed by three years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:   /s/ *David B. Liss*
      DAVID B. LISS
      Assistant United States Attorney
      D.C. Bar No. 90017629
      United States Attorney's Office
      601 D Street, N.W.
      Washington, D.C. 20530
      Telephone: 202-680-4025
      Email: David.liss2@usdoj.gov